# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

JOHN LAMONTE                                                    CIVIL ACTION

VERSUS                                                          NO: 13-4836-NJB-SS

CAROLYN W. COLVIN, ACTING
COMMISSIONER OF SOCIAL
SECURITY ADMINISTRATION

## REPORT AND RECOMMENDATION

The plaintiff, John Lamonte ("Lamonte"), seeks judicial review, pursuant to Section 405(g) of the Social Security Act (the "Act"), of the final decision of the Commissioner of the Social Security Administration (the "Commissioner") denying his claims for disability insurance benefits and supplemental security income ("SSI") under Titles II and XVI of the Act, 42 U.S.C. §§ 423 and 1382.

## HISTORY

On June 13, 2011, Lamonte was a passenger in a pickup truck driven by Alvin Ramirez, when the vehicle ran off the highway into a ditch. Lamonte was thrown about in the truck. He alleged that he suffered injuries from the accident. Lamonte's employer, Brand Energy Solutions, LLC ("Brand"), owned the truck and Ramirez was Lamonte's supervisor. CA 11-1619 - Rec. doc. 1.[1]

On July 21, 2011, Lamonte submitted applications for benefits. R. 116-129. He alleged that

---

[1] On July 11, 2011, Lamonte filed a complaint in the Eastern District of Louisiana against Brand, alleging that Ramirez and Brand were negligent. CA 11-1619 - Rec. doc. 1. Brand contended the accident occurred while Lamonte was in the course and scope of his employment and that the suit was barred by the Louisiana Worker's Compensation Act. Rec. doc. 14. The action was transferred to the Middle District of Louisiana as the proper venue. Rec. doc. 15. Brand's motion for summary judgment regarding work status was denied. MDLA - CA 11-762 - Rec. doc. 56. On August 21, 2012, the action was dismissed after it was settled. Id. - Rec. doc. 62.

he became unable to work on June 13, 2011, the date of the accident.  He reported that he was unable to work because of acute moderate cervical, thoracic and lumbar strains, pain in the neck, upper and lower back, headaches, and pain and numbness in the right arm.  R. 144 and 147.  The applications were denied.  R. 62-65.  On March 27, 2012, there was a hearing before an Administrative Law Judge ("ALJ").  R. 29-47.  On April 12, 2012, the ALJ issued an unfavorable decision.  R. 7-28.  On May 2, 2013, the Appeals Council denied the request for review.  R. 1-4.  On June 18, 2013, Lamonte filed a complaint in federal court.  Rec. doc. 1.  The parties submitted cross-motions for summary judgment.  Rec. docs. 12 and 14.

## STATEMENT OF ISSUES ON APPEAL

**Issue No 1.**     Did the ALJ err in his evaluation of the opinions of Drs. Nicholas Cefalu and Kenneth Vogel?

**Issue No 2.**     Did the ALJ err in his evaluation of Lamonte's credibility?

**Issue No 3.**     Did the ALJ err in his finding at Step Two?

**Issue No 4.**     Did the ALJ err in his determination of Lamonte's residual functional capacity?

## THE COMMISSIONER'S FINDINGS RELEVANT TO ISSUES ON APPEAL

The ALJ made the following findings relevant on appeal:

1.     Lamonte met the insured status requirements of the Act through March 31, 2012.

2.     Lamonte has not engaged in substantial gainful activity since June 13, 2011, the alleged onset date (20 C.F.R. §§ 404.1571 et seq. and 416.971 et seq.).

3.     Lamonte has the following medically determinable impairments:  cervical and lumbar sprain/strain (20 C.F.R. §§ 404.1521 et seq. and 416.921 et seq.).

4.     Lamonte does not have an impairment or combination of impairments that has significantly limited (or is expected to significantly limit) the ability to perform basic work-related activities for 12 consecutive months; therefore, Lamonte does not have a severe impairment or combination of impairments (20 C.F.R. §§ 404.1521 et seq. and 416.921 et seq.).

2

5.      Lamonte has not been under a disability, as defined in the Act, from June 13, 2011, through the date of this decision (20 C.F.R. 404.1520(c) and 416.920(c)).

6.      In the alternative, Lamonte has the following severe impairments: cervical sprain/strain and lumbar sprain/strain (20 C.F.R. 404.1520(c) and 416.920(c)).

7.      Lamonte does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

8.      Lamonte has the residual functional capacity to perform the full range of medium work as defined in 20 C.F.R. §§ 1567(c) and 416.967(c).

9.      Lamonte is capable of performing past relevant work as a lead carpenter and, likely, as self-employed janitor/cleaner.  This work does not require the performance of work-related activities precluded by Lamonte's residual functional capacity (20 C.F.R. §§ 404.1565 and 416.965).

10.     Lamonte has not been under a disability, as defined in the Act, from June 13, 2011, through the date of this decision (20 C.F.R. 404.1520(f) and 416.920(f)).

R. 12-23.

## ANALYSIS

a.      **Standard of Review.**

The function of this court on judicial review is limited to determining whether there is substantial evidence in the record to support the final decision of the Commissioner as trier of fact and whether the Commissioner applied the appropriate legal standards in evaluating the evidence. Perez v. Barnhart, 415 F.3d 457, 461 (5th Cir. 2005); Newton v. Apfel, 209 F.3d 448, 452 (5th Cir. 2000).  Substantial evidence is more than a scintilla but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427 (1971); Perez, 415 F.3d at 461. Alternatively, substantial evidence may be described as that quantum of relevant evidence that a

reasonable mind might accept as adequate to support a conclusion.  Carey v. Apfel, 230 F.3d 131, 135 (5th Cir. 2000).  This court may not re-weigh the evidence, try the issues *de novo* or substitute its judgment for the Commissioner's.  Perez, 415 F.3d at 461; Selders v. Sullivan, 914 F.2d 614, 617 (5th Cir. 1990).

The administrative law judge is entitled to make any finding that is supported by substantial evidence, regardless of whether other conclusions are also permissible.  See Arkansas v. Oklahoma, 503 U.S. 91, 113, 112 S.Ct. 1046, 1060 (1992).  Despite this court's limited function, it must scrutinize the record in its entirety to determine the reasonableness of the decision reached and whether substantial evidence exists to support it.  Villa v. Sullivan, 895 F.2d 1019, 1022 (5th Cir. 1990); Johnson v. Bowen, 864 F.2d 340, 343-44 (5th Cir. 1988).  Any findings of fact by the Commissioner that are supported by substantial evidence are conclusive.  Ripley v. Chater, 67 F.3d 552, 555 (5th Cir. 1995).

To be considered disabled and eligible for disability insurance benefits, plaintiff must show that he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).  The Commissioner has promulgated regulations that provide procedures for evaluating a claim and determining disability.  20 C.F.R. §§ 404.1501 to 404.1599 & appendices, §§ 416.901 to 416.998 (1997).  The regulations include a five-step evaluation process for determining whether an impairment prevents a person from engaging in any substantial gainful activity.  Id. §§ 404.1520, 416.920; Perez, 415 F.3d at 461; Greenspan v. Shalala, 38 F.3d 232, 236

(5th Cir. 1994), cert. den. 514 U.S. 1120, 115 S. Ct. 1984 (1995).[2]  The five-step inquiry terminates

if the Commissioner finds at any step that the claimant is or is not disabled.  Leggett v. Chater, 67

F.3d 558, 564 (5th Cir. 1995).

 The claimant has the burden of proof under the first four parts of the inquiry.  Id.  If he

successfully carries this burden, the burden shifts to the Commissioner to show that other substantial

gainful employment is available in the national economy, which the claimant is capable of

performing.  Greenspan, 38 F.3d at 236; Kraemer v. Sullivan, 885 F.2d 206, 208 (5th Cir. 1989).

When the Commissioner shows that the claimant is capable of engaging in alternative employment,

"the ultimate burden of persuasion shifts back to the claimant." Id.; accord Selders, 914 F.2d at 618.

 "In determining whether substantial evidence of disability exists, this court weighs four

factors: (1) objective medical evidence; (2) diagnoses and opinions; (3) the claimant's subjective

medical evidence of pain and disability; and (4) the claimant's age, education, and work history."

---

[2]  The five-step analysis requires consideration of the following:

 First, if the claimant is currently engaged in substantial gainful employment, he or she is found not disabled. 20 C.F.R. §§ 404.1520(b), 416.920(b).

 Second, if it is determined that, although the claimant is not engaged in substantial employment, he or she has no severe mental or physical impairment which would limit the ability to perform basic work-related functions, the claimant is found not disabled.  Id. §§ 404.1520(c), 416.920(c).

 Third, if an individual's impairment has lasted or can be expected to last for a continuous period of twelve months and is either included in a list of serious impairments in the regulations or is medically equivalent to a listed impairment, he or she is considered disabled without consideration of vocational evidence.  Id. §§ 404.1520(d), 416.920(d).

 Fourth, if a determination of disabled or not disabled cannot be made by these steps and the claimant has a severe impairment, the claimant's residual functional capacity and its effect on the claimant's past relevant work are evaluated.  If the impairment does not prohibit the claimant from returning to his or her former employment, the claimant is not disabled.  Id. §§ 404.1520(e), 416.920(e).

 Fifth, if it is determined that the claimant cannot return to his or her former employment, then the claimant's age, education and work experience are considered to see whether he or she can meet the physical and mental demands of a significant number of jobs in the national economy.  If the claimant cannot meet the demands, he or she will be found disabled.  Id. §§ 404.1520(f)(1), 416.920(f)(1).  To assist the Commissioner at this stage, the regulations provide certain tables that reflect major functional and vocational patterns.  When the findings made with respect to claimant's vocational factors and residual functional capacity coincide, the rules direct a determination of disabled or not disabled. Id. § 404, Subpt. P, App. 2, §§ 200.00-204.00, 416.969 (1994) ("Medical-Vocational Guidelines").

<u>Perez</u>, 415 F.3d at 462.  "The Commissioner, rather than the courts, must resolve conflicts in the evidence."  <u>Martinez v. Chater</u>, 64 F.3d 172, 174 (5th Cir. 1995).

b.  **<u>Testimony at the March 27, 2012 Hearing</u>.**

At the time of the hearing Lamonte was 48.  R. 32.  He had completed the eighth grade.  R. 32.  He had worked as a lead carpenter.  R. 34.  On June 13, 2011, he was a passenger in a pick-up truck, when an accident occurred.  R. 34.  The truck was going around a curve, something happened, and the truck went off the road, became airborne and hit a tree stump.  R. 34.  He was on his way to work when the accident occurred.  R. 35.  His supervisor was driving the truck.  R. 35.  Lamonte had spoken to him once since the accident.  R. 35.  Lamonte has not worked since the accident.  R. 32.  Lamonte was unable to work because of pain in his back.  R. 33.  He had two bulging discs in his low back and one in his neck.  R. 33.  No date was set for surgery to his neck, but it was going to happen.  R. 35-36.  There would be back surgery after the neck surgery.  R. 36.  He had not had a problem with his back until the June 2011 auto accident.  R. 34.

He could not hold out his hands in front of him for long without his arms hurting.  R. 32-33 and 38.  He could not sleep at night.  R. 34.  He had problems sitting for long periods of time.  R. 38.  When he lay down, he had to get up about every 90 minutes and move around.  R. 38.  There was numbness in his arms and legs.  R. 38.  He could not stand for more than 15 minutes.  R. 38.  He took Lortab and Soma for pain.  R. 39.  His surgeon, Dr. Vogel, was sending him to a pain management clinic.  R. 39.  Dr. Vogel, Dr. Cefalu and Dr. Anthon told him not to work.  R. 39-40.

Lamonte's wife did not work outside the home.  R. 42.  She did all the work required in the house and took care of him.  R. 42.  Lamonte hired someone to mow the grass.  R. 43.

6

Jennifer Lamonte, the claimant's wife, testified that they had been married for more than a year.  R. 43.  She reported that:  (1) Lamonte was unable to work (R. 44); (2) she did all the housework, including grocery shopping and taking care of pets (R. 44); (3) Lamonte had herniated and torn discs in his lower back and neck (R. 45); (4) he was waiting for surgery (R. 45); (5) he had trouble sleeping, standing for long periods, and holding out his arms (R. 45); (6) he was under doctors' orders not to return to work (R. 45); and (7) he had not worked since the accident (R. 45).

c.    **Medical Evidence**.

On June 13, 2011 at about 11:45 a.m., Lamonte was seen at North Oaks Medical Center ("North Oaks") emergency room.  R. 208.  He was not in acute distress.  R. 209.  He complained of moderate diffuse posterior back pain progressively worsening after the accident.  R. 210.  He reported no pain initially, but felt everything tighten up across his entire back.  R. 210.  The neurologic examination was negative.  R. 210.  The diagnosis was back strain.  R. 210.  There was no neck pain.  R. 210.  Hydrocodone tablets for about 2 days were prescribed.  R. 211 and 263.  After he was out of hydrocodone, he could take Tylenol for pain.  R. 210 and 265.  He could return to work in 2 to 3 days.  R. 210 and 264-65.  There were no restrictions.  R. 210 and 264.  No x-rays were taken at North Oaks.  R. 241.

On June 13, 2011, an accident report was completed by Gulf Coast Occupational Medicine, Inc. R. 285.  Lamonte went to Gulf Coast at 3:10 p.m. on June 13, 2011.  R. 288.  Lamonte reported lower back pain on the right and left side and neck pain on the right side.  A straight leg test was negative bilaterally.  There was no joint swelling or redness.  The neurological exam was normal.  The diagnosis was cervical spine strain and lumbar strain.  He was to return on June 15.  R. 286.  X-rays were negative.  R. 201 and 287.  He was released for regular duty as tolerated.  R. 288.

On June 22, 2011, Lamonte's attorney in his personal injury action referred him to Dr. George Anthon, a chiropractor.  R. 240.[3]  Lamonte reported that the pain was constant.  R. 241.  His movements were restricted, stiff and guarded.  R. 242.  The gait was uneven.  The pain was moderate to severe at times.  R. 242.  There was tenderness in the cervical region with spasms.  R. 242.  Dr. Anthon excused Lamonte from work from June 13 through July 6, 2011.  R. 349.

On June 23, 2011, Lamonte was seen at the Albany Health Care Clinic.  He reported constant pain in his lower back without radiation, pain in his neck and shoulders, and numbness and tingling in his arms bilaterally.  The pain was worse when he was lying down.  He was not on medication.  There was pain in his neck with a full range of motion with palpable tenderness along the cervical spine.  There was pain in his back with range of motion at the lumbar spine, no palpable tenderness and the straight leg raise test was negative bilaterally.  There was some pain with range of motion and palpation of the shoulders.  R. 219.  The diagnosis was neck and back pain.  Mobic, Flexeril and Lortab were prescribed with no refills.  R. 219 and 220.  Lamonte was to avoid further exercise for 2 weeks and follow Dr. Anthon's directions regarding further activity.  R. 219-220.  He was authorized to return to work on July 7, 2011.  R. 222.

On June 28, 2011, Dr. Anthon provided Lamonte's attorney with a tentative diagnosis of acute moderate cervical, thoracic and lumbar sprains.  R. 245.  Lamonte was being treated with physical therapy and manual manipulation of the spine to reduce subluxations.  R.246.

On July 1, 2011, Lamonte went to the North Oaks emergency room complaining of low back pain.  He was not in acute distress. R. 200.  He reported that he was seen at Albany Walk-in clinic

---

[3] From June 22, 2011 through March 24, 2012, Lamonte was seen at Anthon Chiropractic Care about 12 to 13 times per month.  R. 234, 237, 247, 248 and 299-347.  There are no records of treatment at Anthon Chiropractic after March 24, 2012.

but it did not give him anything for pain.  R. 199.  He was out of pain medication.  R. 201.  He was in obvious discomfort due to his low back pain with movement.  R. 201.  He had an upright gait. There was generalized tenderness about the low back with palpation.  There was slight improvement with massage.  There was equal strength to the bilateral extremities.  The straight leg test was negative.  R. 201.  The neurological exam was negative.  R. 201.  The anti-inflammatory medication was changed.  He was continued on Flexeril.  Pain medication was prescribed.  R. 201.

On July 1, 2011, Lamonte was also seen by Dr. Anthon, who noted that Lamonte went to North Oaks and was given a prescription for pain medication and an anti-inflammatory.  It was noted that he also saw a pain management doctor.  R. 234.  The note for Lamonte's visit to Dr. Anthon on July 11, 2011, one month after the accident, indicates that Lamonte reported low back pain, headaches, right arm pain, and numbness.  R. 247.

Dr. Nicholas Cefalu first saw Lamonte on July 20, 2011.  R. 275.[4]  The physical examination found pain, limited range of motion and spasms with cervical and lumbar flexion, extension, bending and rotation and all movements of the thoracic spine.  R. 277.  There was tenderness to palpitation in these same areas.  R. 277.  The neurological exam was normal.  R. 277.  The straight leg raising tests were mildly positive.  R. 277.  The diagnoses were acute bilateral cervical, thoracic and lumbar strains and sprains with associated headaches and associated cervical and lumbar neuralgia.  R. 278. Pain medication and muscle relaxants were prescribed.  R. 278.  Dr. Cefalu opined that Lamonte was

---

[4]  There are no notes of Lamonte's visits to Dr. Cefalu.  There is only Dr. Cefalu's September 22, 2011 report to Lamonte's personal injury attorney reporting on visits on July 20 and September 7, 2011.  R. 275-284. It also reports Lamonte returned to Dr. Cefalu's office on July 27, August 10, August 24 and September 7.  R. 278.

Lamonte reported to Dr. Anthon that he was seen by Dr. Cefalu on September 7, October 5, October 19 and November 16.  R. 302, 305, 307 and 310.  On November 21, 2011, Lamonte reported to Dr. Anthon that he was no longer seeing Dr. Cefalu.  R. 311.  However, on March 20, 2012, Lamonte reported to Dr. Anthon that he saw Dr. Cefalu on March 19, 2012.  R. 345.

completely disabled from work and unable to hold any gainful employment for the indefinite future. R. 278.

The note for Lamonte's visit to Dr. Anthon on August 11, 2011, two months after the accident, indicates that Lamonte denied any recent changes in his pain. His right arm numbness was more frequent. He reported incontinence. R. 300. On August 15, 2011, Lamonte reported trouble sleeping due to pain. R. 300.

The summary by Lawrence W. Glorioso, III, M.D., for an August 19, 2011 cervical MRI was:

1.  Subligamentous herniation of the C5-C6 intervertebral disc with annulus fibrosus tear with subligamentous extrusion of disc material demonstrating edema, hemorrhage, or ingrowth of fibroblastic tissue.

2.  Loss of the cervical lordosis indicating a pattern of muscle spasm attendant the aforementioned cervical spine pathology.

R. 251-252. The summary by Dr. Glorioso for an August 19, 2011 lumbar MRI was:

1.  Far lateral herniation of the L4-L5 intervertebral disc. Correlation with the right L4 nerve root symptomatology distal to the dorsal root ganglion is suggested.

2.  Protrusion of the L5-S1 intervertebral disc with annulus fibrosus tear. I cannot exclude a contained subligamentous herniation of the intervertebral disc. Weight-bearing multi-possession assessment would help in further evaluation thereof.

3.  Narrowing of T11-T12 intervertebral disc consistent with a pattern of spondylosis.

4.  Straightening of the lumbar lordosis consistent with a pattern of muscle spasm.

R. 255-56. Based on these findings, Dr. Anthon recommended to Lamonte's attorney that Lamonte consult a neurosurgeon for an evaluation. R. 356.

10

On September 7, 2011, Lamonte was seen by Dr. Cefalu.  R. 278-79.  He reported recurrent and significant episodes of neck pain, occipital headache pain, upper back pain and lower back pain. R. 279.  There was minimal improvement since July 20, 2011.  R. 279.  He was treated with pain medication, muscle relaxers, anti-inflammatories and heat treatment.  R. 279.  He remained unable to hold any type of gainful employment for the indefinite future.  R. 280.

Dr. Cefalu described the results of the August MRIs.  R. 280-82.  He reported that further cervical, thoracic and lumbar diagnostic tests, including thoracic MRI scan, cervical and lumbar CT scans, discograms, myelograms and nerve conduction studies were clinically indicated.  R. 282.  It was Dr. Cefalu's opinion that Lamonte could be a surgical candidate for neurosurgical correction of multiple disc lesions.  R. 284.

The note for Lamonte's visit to Dr. Anthon on September 8, 2011, nearly three months after the accident, indicates that he woke up with right sided neck pain into his shoulder.  He reported low back pain, headaches, left hip pain, right arm pain, numbness in both arms and incontinence.  R.302.

Lamonte was seen by Dr. Vogel on October 31, 2011.  R. 290-291.  The cervical and lumbosacral examinations revealed a mild degree of limitation of motion in all directions and a mild degree of muscle spasms bilaterally.  R. 290-91.  In the cervical examination, there was tenderness on the right.  R. 290.  The motor examination was normal except for a grip of 160 on the right and 200 on the left.  R. 290.  The sensory examination revealed no abnormalities.  R. 290.  The reflexes were +2.  The facet examination revealed tenderness.  There was right rotator cuff pain.  R. 291. The lumbosacral examination revealed mild scoliosis on the left.  R. 291.  The straight leg test was positive.  R. 291.  The motor examination was limited by pain.  R. 291.  The reflexes were +1.  The facet examination revealed tenderness.  R. 291.  The remainder of the neurologic exam was within

normal limits.  R. 219.  Dr. Vogel agreed with Dr. Glorioso's report regarding the August MRIs.  R. 291.  The diagnoses were herniated cervical and lumbar discs versus segmented instability.  R. 291.  Lamonte was disabled from his normal duties.  R. 291.  Dr. Vogel recommended that he continue conservative care, including physical therapy and medications.  R. 291.

On November 21, 2011, Lamonte returned to Dr. Vogel for re-evaluation for cervical and right upper arm pain.  The results of the cervical and lumbrosacral examinations were about the same as those reported by Dr. Vogel on October 31, 2011.  R. 289.  The diagnosis was unchanged from October 31, 2011.  Dr. Vogel offered hospital admission for further evaluation.  Lamonte was a surgical candidate pending test results.  R. 289.

On December 21, 2011, Lamonte reported that he was seen by Dr. Robert Applebaum, a neurologist in New Orleans, at the request of the defendant in the personal injury action.  R. 313 and 314.  He also reported that Dr. Cefalu called him and told him that an EMG indicated he had a pinched nerve in his neck.  R. 314.  On January 20, 2012, Lamonte reported to Dr. Anthon's office that he would be seeing a specialist for his incontinence.  R. 323.

On March 13, 2012, Lamonte reported to Dr. Anthon's office that he was not taking pain medication because he ran out on Sunday and his pain was increasing.  His neurosurgery was postponed, so he could not obtain a prescription for pain medication from Dr. Vogel.  He was trying to obtain an appointment with a pain management doctor to obtain pain medication.  R. 343 and 344.

On March 20, 2012, Lamonte reported seeing Dr. Cefalu the day before but he did not prescribe pain medication.  He continued to experience pain because he was out of medication.  R. 345.  On March 22, 2012, Lamonte reported that he was waiting on a call from his attorney for a

referral to a medical doctor for more pain medication.  R. 346.  On March 24, 2012, Lamonte

reported to Dr. Anthon's office that he was taking his sister's left over pain medication.  R. 347.

d.    **Plaintiff's Appeal.**

**Issue No 1.**    Did the ALJ err in his evaluation of the opinions of Dr. Nicholas Cefalu and Dr.
            Kenneth Vogel?

The ALJ accorded no weight to the medical opinion of Dr. Cefalu and little weight to the

medical opinion of Dr. Vogel.  R. 15.  Lamonte contends that:  (1) it was legal error for the ALJ to

consider and address the findings of the single decision maker; (2) even though the ALJ did not

accord weight to those findings, the ALJ's decision must be treated as according weight to them; (3)

the ALJ erred in according no weight to Dr. Cefalu and little weight to Dr. Vogel; (4) the ALJ erred

in substituting his lay opinions for their diagnoses and opinions; (5) the ALJ failed to accord their

opinions the weight required by law; and (6) the ALJ failed to evaluate the opinion of Dr. Anthon,

the chiropractor.  Rec. doc. 12 (Memorandum at 13-19).

A.    Are Drs. Cefalu and Vogel treating physicians?

In Newton v. Apfel, 209 F.3d 448 (5th Cir. 2000), the Fifth Circuit stated:

>        The Court concludes that, absent reliable medical evidence from a treating
> or examining physician controverting the claimant's treating specialist, an ALJ may
> reject the opinion of the treating physician only if the ALJ performs a detailed
> analysis of the treating physician's views under the criteria set forth in 20 C.F.R. §
> 404.1527(d)(2).  Additionally, if the ALJ determines that the treating physician's
> records are inconclusive or otherwise inadequate to receive controlling weight,
> absent other medical opinion evidence based on personal examination or treatment
> of the claimant, the ALJ must seek clarification or additional evidence from the
> treating physician in accordance with 20 C.F.R. § 404.1512 (e).

Id. at 453.  The Fifth Circuit added that,

> Even though the opinion and diagnosis of a treating physician should be afforded
> considerable weight in determining disability, the ALJ has sole responsibility for
> determining a claimant's disability status.  The ALJ is free to reject the opinion of

13

any physician when the evidence supports a contrary conclusion. The treating physician's opinions are not conclusive. The opinions may be assigned little or no weight when good cause is shown. Good cause may permit an ALJ to discount the weight of a treating physician relative to other experts where the treating physician's evidence is conclusory, is unsupported by medically acceptable clinical, laboratory, or diagnostic techniques, or is otherwise unsupported by the evidence.

Id. at 455-56 (citations, quotation marks and brackets omitted).

The Commissioner responds that Drs. Cefalu and Vogel were not treating physicians because: (1) there are no medical records from them other then the consultative reports sent to Lamonte's attorney in the personal injury action; (2) it appears that Dr. Cefalu only reviewed medical records and did not conduct a personal examination; and (3) the consultative reports did not provide the detailed, longitudinal picture of Lamonte's condition necessary to consider either Dr. Cefalu or Dr. Vogel as treating physicians under the regulations (20 C.F.R. §§ 404.1527(c)(2) and 416.927(c)(2)).

In Newton, the treating specialist was a rheumatologist, who began seeing the claimant in 1989 and submitted an assessment describing the claimant's limitations in 1995. The regulations refer to the longitudinal picture provided by a treating physician. 20 C.F.R. § 404.1527(c)(2).

Lamonte was seen by Dr. Vogel for a consultation on October 31, 2011. R. 290-91. He returned for a re-evaluation on November 21, 2011. R. 289. Other than the October 31 and November 21 reports, there are no notes of any treatment provided by Dr. Vogel. The reports are only 3 weeks apart. There was no longitudinal relationship between Dr. Vogel and Lamonte. Dr. Vogel was not a treating specialist.

There are no records of Lamonte's treatment by Dr. Cefalu except Dr. Cefalu's report of September 22, 2011. Lamonte was referred to Dr. Cefalu by Lamonte's attorney in the personal injury action. Although the Commissioner contends that it does not appear that Dr. Cefalu

14

conducted a personal examination of Lamonte, the September 22, 2011 report refers to examinations on July 20, 2011 ("John Lamonte . . . presented to my office initially on July 20, 2011. . . .") and September 7, 2011 ("most recently to my office on September 7, 2011."). R. 275 and 278. Dr. Cefalu reports that Lamonte "returned to my office" on July 27, August 10 and August 24, 2011. R. 278. Lamonte reported he was seen by or went to Dr. Cefalu's office in September, October and November 2011. R. 302, 305, 307 and 310. On November 21, 2011, Lamonte reported he was no longer seeing Dr. Cefalu. R. 311. In March 2012, Lamonte returned to Dr. Cefalu in an unsuccessful attempt to secure a prescription for additional pain medication. R. 345. At most this demonstrates 4 months of treatment by Dr. Cefalu from July 20 through November 16, 2011. Because there are no notes of treatment it is impossible to tell whether Lamonte was seen by Dr. Cefalu or a nurse on any occasions other than July 20 and September 7, 2011. The record does not present the longitudinal relationship required for consideration of Dr. Cefalu as Lamonte's treating physician.

> B.     Are the opinions of Drs. Cefalu and Vogel consistent with objective evidence?

The ALJ accorded no weight to Dr. Cefalu's medical opinion because it was inconsistent with the objective medical evidence. Dr. Cefalu opined that,

> Lamonte's cervical, thoracic, and lumbar injuries were sustained and were a direct result of this June 13, 2011, motor vehicle accident. . . . At the time of initial presentation (July 20, 2011), John Lamonte, in my medical opinion, was completely disabled from work and unable to hold any type of gainful employment whatsoever indefinitely at that time.

R. 278. As of September 7, 2011, Dr. Cefalu's prognosis was extremely guarded. He recommended referral for an initial neurosurgical or orthopaedic surgical evaluation. R. 283.

The ALJ contrasted Dr. Cefalu's medical opinion with objective medical evidence.  X-rays taken immediately after the accident were negative.  R. 201.

The August 19, 2011 cervical MRI found:  (1) loss of cervical lordosis with the cervical vertebrae in acceptable anatomic alignment and no evidence of bony central canal or neural foraminal stenosis; (2) the intradural structures were unremarkable and there was no unequivocal evidence of defect; (3) for the extradural structures other than C-5-C6, there was minimal desiccation with appropriate disc space height and with posterior margins of the intervertebral discs parallel to the adjacent vertebral end plates; and (4) at C5-C6 the MRI found minimal desiccation with appropriate disc space height, but also full thickness annulus fibrosus tear with subligamentous extrusion of disc material without spinal cord effacement.  R. 251-252.

The August 19, 2011 lumbar MRI found:  (1) straightening of the lumbar lordosis with the lumbar vertebrae in acceptable anatomic alignment and no evidence of bony central canal or neural foraminal stenosis; (2) the intradural structures were unremarkable and there was no evidence of defect; (3) the extradural structure, T11-T12, was unremarkable with posterior margins of the disc parallel the adjacent vertebral end plates, but the height of the disc space was diminished; (3) T12-L1, L1-L2 and L2-L3 were unremarkable with appropriate disc space height and posterior margins of the discs parallel to the adjacent vertebral end plates; (5) L3-L4 was unremarkable with appropriate disc space and bulging of the intervertebral disc eccentric toward the right and left posterolateral margins; (6) there was minimal desiccation with diminished disc space height at L4-L5 with posterior prominence of the intervertebral disc effacing the right L4 nerve root; and (7) there was minimal desiccation with appropriate disc space height at L5-S1 with posterior prominence of the intervertebral disc with annulus fibrosus tear.  R. 254-55.

16

The neurological exams immediately after the accident at North Oaks and Gulf Coast Occupational Medicine were negative.  210 and 286.  Ten days after the accident the physical exam at Albany Health Care was negative for neurological symptoms, the straight leg test was negative bilaterally and there was equal hand grip bilaterally.  R. 219.  On July 1, 2011, Lamonte returned to North Oaks.  Neurosensory was intact to the bilateral extremities.  There were no positive signs on the neurological exam.  The straight leg raise test was negative.  There was equal strength to the bilateral lower extremities.  R. 201.

The ALJ described the objective medical findings as presenting "minor findings," showing "only mild and minimal signs," and suggesting "only mild to minimal symptoms and no significant neurological deficits related to the diagnoses of cervical and lumber sprain/strain." R. 14-15 and 20-21.  There is substantial evidence to support the ALJ's description of the objective medical evidence.

"The ALJ is free to reject the opinion of any physician when the evidence supports a contrary conclusion."  Newton, 209 F.3d at 455 (quoting Paul v. Shalala, 29 F.3d 208, 211 (5th Cir. 1994)).  Because of the conflict between the objective medical evidence and Dr. Cefalu's medical opinion and characterization of that evidence, the ALJ was free to reject Dr. Cefalu's opinion.

The ALJ accorded only little weight to the opinion of Dr. Vogel.  He found that Dr. Vogel's opinion was inconsistent with the objective medical evidence.  R. 15.  For the reasons described above, there is substantial evidence to support the ALJ's finding that the objective medical evidence was inconsistent with Dr. Vogel's opinion.  The ALJ was free to reject it.

Drs. Cefalu and Vogel also opined that Lamonte was unable to return to work.  These are not medical opinions.  They concern an issue reserved to the Commissioner.  The ALJ was free to reject them.  Frank v. Barnhart, 326 F.3d 618, 620 (5th Cir. 2003).

17

C.     Did the ALJ substitute his lay opinion?

Lamonte contends that the ALJ's characterization of the objective medical evidence as presenting "minor findings," "mild to minimal signs," and "mild to minimal symptoms" was an improper substitution of his lay opinions for that of the medical opinions of Drs. Cefalu and Vogel. The Commissioner responds that the ALJ, as the finder, has the sole responsibility for evaluating Lamonte's capacity for work based on the record as a whole.  20 C.F.R. § 404.1546.  It urges that the task of weighing the evidence and resolving conflicting evidence is the province of the ALJ. Newton, 209 F.3d at 452 (citing Selders v. Sullivan, 914 F.2d 614, 617 (5th Cir. 1990).

At the hearing, Lamonte testified that he was under doctors' orders not to work.  R. 39.  He referred to Drs. Vogel, Cefalu and Anthon (the chiropractor).  He testified that he would no longer see Dr. Cefalu because he would be sent to pain management.  R. 40.  Lamonte's counsel at the hearing asked that the record be held open so that records from these doctors could be added to the record.  R. 40.  The counsel reported that he only received the records the morning of the hearing. R. 46.  The ALJ agreed to keep the record open.  R. 41 and 46.  Some of these records were from Lamonte's attorney in the personal injury action.  R. 358-367.[5]

The treatment records submitted after the hearing were described in detail and thoroughly discussed by the ALJ.  R. 14-15 and 17-20.  Rather than substituting his lay opinion for the opinions of Drs. Cefalu and Vogel, it is plain that the ALJ was engaged in resolving conflicts in the evidence.

---

[5]  Lamonte did not submit all of the reports from physicians who examined him after the accident.  Lamonte reported that he was seen by Dr. Robert Applebaum, a neurologist, on December 20, 2011.  R. 313-314.  Although Lamonte was entitled to a copy of Dr. Applebaum's report (Fed. R. Civ. 35(b)(1)), there is no report by Dr. Applebaum. It is noted that counsel for persons alleging cervical and lumbar injuries frequently refer their clients to Dr. Vogel, whereas counsel for parties defending such claims frequently request that the plaintiff be examined by Dr. Applebaum in the record.  Lamonte describes the examination by Dr. Applebaum as an "IME."  R. 313-314.

D.     <u>Did the ALJ err regarding the single decision maker</u>?

On September 16, 2011, Paul Robertson, a single decision maker ("SDM"), completed disability determination explanations. R. 50-61. Robertson described the medical disposition as non severe and stated that the impairment or combination of impairments did not significantly limit the physical or mental ability to do basic work activities.  R. 53 and 59.  The ALJ noted that:  (1) a conclusion of a single decision maker is not a medical opinion and is not entitled to the same consideration as the opinion of a non-examining State medical consultant; and (2) "[a]lthough the conclusion of the SDM is found to be consistent with the medical evidence, it has been given no weight as it is not a medical source opinion."  R. 21.

On September 14, 2010, the Office of the Chief Administrative Law Judge issued a memorandum concerning the consideration of single decision maker's findings, including RFC. Rec. doc. 12 (Appendix at 2).  Robertson did not make an assessment of the residual functional capacity. The Chief ALJ stated that ALJs must not consider other findings by a single decision maker as opinion evidence and must not evaluate them in their decision.  <u>Id</u>.  The ALJ was explicit that no weight was given to Robertson's statement as it was not a medical source opinion.  R. 21.  This is consistent with the instruction from the Chief ALJ.

Lamonte argues, however, that it was error for the ALJ to describe Robertson's finding.  This argument is without merit.  Pursuant to SSR 96-6p, 1996 WL 374180 (S.S.A.), findings of fact made by State agency medical consultants regarding the nature and severity of a claimant's impairments must be treated as expert opinion evidence of non-examining sources at the ALJ level of review. <u>Id</u>. at *1.  The ALJ reported that a state medical consultant did not complete a RFC.  R. 21.  The memorandum from the Office of the Chief ALJ reports that tests of the modifications of the

disability determination procedures may be conducted, where a single decision maker is employed. 20 C.F.R. § 404. 906.  The ALJ's reference to Robertson's conclusion accounts for the absence of an opinion of a non-examining state medical consultant.  Where no weight was given to the opinion, the ALJ did not act contrary to the instructions from the Chief ALJ regarding consideration of findings by a single decision maker.

E.    Weight given the single decision maker's statement.

Contrary to the ALJ's statement that no weight was given to the single decision maker's statement that the impairment was not severe, Lamonte contends that the ALJ's decision must be treated as giving the statement great weight.  He reaches this conclusion by citing the ALJ's finding that:  (1) Lamonte did not have a severe impairment; and (2) the single decision maker's conclusion was consistent with the medical evidence.  Lamonte's argument does not follow from the ALJ's decision.

The ALJ's fourth finding determined that Lamonte did not have a severe impairment.  R. 12. The ALJ considered the medical evidence at length.  R. 13-16.  After the ALJ found, in the alternative, that Lamonte had severe impairments (cervical and lumbar sprains/strains) (R. 16), he further considered the medical evidence.  R. 16-21.  Only after thorough consideration of the medical evidence did the ALJ refer to the finding of the single decision maker.  The ALJ states no weight was given to it.  Lamonte's argument does not change the ALJ's statement.

F.      Did the ALJ evaluate Dr. Anthon's opinion?

Lamonte contends that the ALJ failed to evaluate the opinion of Dr. Anthon, the chiropractor. Rec. doc. 12 (Memorandum at 19). The Commissioner contends that the ALJ thoroughly discussed Dr. Anthon's records. This is demonstrated by the record. The ALJ described Dr. Anthon's diagnosis and the frequency of his treatment. R. 14 and 17. The ALJ carefully described the treatment provided by Dr. Anthon in January, February and March 2012. R. 19-20. The ALJ noted that in January, Lamonte's complaints were unchanged, but Dr. Anthon continued to diagnose him with only cervical, thoracic and lumbar strain. The ALJ noted that later in January the diagnosis was changed to cervical and lumbar IVD (intervertebral disc disease) disorder without any explanation by Dr. Anthon for the change in the diagnosis. R. 19. There is no basis for Lamonte's contention that the ALJ failed to evaluate Dr. Anthon's opinion.

**Issue No 2.**      Did the ALJ err in his evaluation of John Lamonte's credibility?

Lamonte contends that the ALJ's evaluation of his credibility was contrary to law and not supported by substantial evidence. He urges that: (1) the ALJ failed to articulate reasons for discrediting his subjective complaints of pain; (2) the ALJ substituted his lay opinions for the diagnoses by Drs. Cefalu and Vogel; (3) the ALJ's focus on evidence of "minimal desiccation" failed to include other evidence from the August 2011 MRIs including lumbar disc herniations and annulus fibrosus tears, which Drs. Cefalu and Vogel asserted were the cause of the Lamonte's reports of disabling pain; and (4) the ALJ failed to articulate legally sufficient reasons for discrediting Lamonte's complaints of pain. Rec. doc. 12 (Memorandum at 20-21). The Commissioner responds that substantial evidence supports the ALJ's determination that Lamonte's impairments were not as severe as he alleged.

21

After the ALJ found, in the alternative, that Lamonte had severe impairments (cervical and lumbar sprains/strains), the ALJ found that Lamonte had the RFC to perform the full range of medium work.  R. 16.  The ALJ described the two-step process to be followed in considering Lamonte's symptoms, including the circumstances under which he was required to make a finding on the credibility of Lamonte's statements.  R. 17.  This is consistent with SSR 96-7p, 1996 WL 374186, and 20 C.F.R. § 404.1529(c)(1).  The ALJ found that Lamonte's medically determinable impairments could reasonably be expected to cause some of the alleged symptoms, but his statements concerning the intensity, persistence, or functioning limiting effects of pain or other symptoms were not credible to the extent they were inconsistent with the RFC.  R. 17 and 21.  The ALJ found that the subjective complaints of totally disabling pain were not credible because:  (1) no objective evidence pointed to such severe complaints; (2) the evidence, including involvement of a personal injury attorney, demonstrated an impetus for exaggerating claims of pain; (3) the sporadic nature of Lamonte's earnings for the years 1995-2011 (R. 132 and 139) indicated that factors other than the impairments kept Lamonte out of the workforce long before the June 13, 2011 accident; and (4) the lack of any more aggressive treatment or even evidence of
 a genuine effort to identify any more effective course of treatment was incompatible with totally disabling pain.  R. 21-22.

SSR 96-7p notes that it is not sufficient for the ALJ to make a single conclusory statement that an "individual's allegations have been considered" or that "the allegations are not credible."  The Ruling requires that,

> The . . . decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.

1996 WL 374186, *2.  The ALJ did not make a single conclusory statement.  He provided 4 specific reasons for the finding on credibility.  R. 21-22.

The ALJ's first reason was that no objective evidence points to Lamonte's severe complaints. The Court has found that there is substantial evidence to support the ALJ's description of the objective medical evidence as presenting minor findings and mild to minimal signs and symptoms. Because of the conflict between this evidence and the medical opinions of Drs. Cefalu and Vogel, the ALJ was able to accord no weight to Dr. Cefalu's opinion and only little weight to Dr. Vogel's opinion.  For the same reasons, there is substantial evidence for the ALJ's finding that no objective evidence pointed to Lamonte's severe complaints.

The ALJ described the evidence as demonstrating a nomogenic impetus for exaggerating the claims of pain, namely the involvement of a personal injury attorney.  Immediately after the accident, Lamonte was seen at North Oaks and Gulf Coast Occupational Medicine.  The x-rays were negative.  The results of the neurological exams at both facilities were negative.  North Oaks reported that he could return to work in 2 or 3 days.  R. 210, 264-65 and 285-88.  Less than 10 days later, the attorney in his personal injury action referred him to Dr. Anthon.  Lamonte told Dr. Anthon that his pain was constant.  R. 240-41.  When he returned to North Oaks on July 1, 2011, the results of the neurological exam were again negative.  R. 201.  There is substantial evidence to support the ALJ's finding regarding the impetus for Lamonte to exaggerate his claims of pain.

From 1995 through 2010, there were  7 years with no earnings and 4 years with less than $3,000 in earnings.  R. 132 and 139.  Lamonte's earnings were sporadic.  Lamonte reported that his pains began after the accident.  R. 275.  There was substantial evidence to support the ALJ's finding

23

that the sporadic earnings demonstrated that factors other than impairments kept Lamonte out of the workforce before the accident.

The ALJ noted that the lack of any more aggressive treatment or even evidence of a genuine effort to identify any more effective course of treatment was incompatible with totally disabling pain and limitations.  After November 21, 2011, Lamonte had no further contact with Dr. Vogel.  R. 289.  By March 2012, neither Dr. Vogel nor Dr. Cefalu would prescribe pain medication for him.  R. 343-45.  He reported to Dr. Anthon that he was waiting on a call from his attorney in the personal injury action for a referral to a pain management doctor.  R. 346.  By March 2012, Lamonte's medical doctors were not prescribing pain medication.  This is inconsistent with Lamonte's complaints of totally disabling pain and limitations.

The ALJ's evaluation of Lamonte's credibility is not contrary to law and it is supported by substantial evidence.

**Issue No 3.**      Did the ALJ err in his finding at Step Two?

Lamonte contends that the ALJ erred in finding that he did not have a severe impairment.  Rec. doc. 12 (Memorandum at 21).  See the ALJ's fourth finding at R. 12.  In his sixth finding, and in the alternative, the ALJ found that Lamonte had a severe impairment.  R. 16.  The ALJ completed the analysis following from this alternative finding of a severe impairment.  R. 16-23.  The ALJ stated that, "even if the alleged impairments were severe, a finding of not disabled would still be required."  R. 16.  The Commissioner contends that the alternative finding moots Lamonte's argument.  Lamonte does not address the alternative finding.  The issue of the ALJ's fourth finding at step two of the five-step analysis is moot.

**Issue No 4.**     Did the ALJ err in his determination of Lamonte's residual functional capacity?

Lamonte's final contention is that after the ALJ made the alternative finding that the impairment was severe, the ALJ erred in determining that he had the RFC to perform a full range of medium work.  Lamonte re-urges the arguments made above.  He contends that the ALJ erred in evaluating his credibility, substituting his lay opinion for the medical opinions of Drs. Cefalu and Vogel, and picking and choosing evidence to support a finding of non-disability.  Rec. doc. 12 (Memorandum at 23).  The Commissioner responds that Lamonte fails to allege any additional functional limitations that should have been found by the ALJ, so he was not prejudiced by the RFC finding.  Rec. doc. 14 (Memorandum at 11).

In support of the RFC for the full range of medium work, the ALJ cited: (1) the lack of Lamonte's credibility regarding the symptoms and restrictions on his activities (R. 17 and 21-22); and (2) the inconsistencies between the opinions of Drs. Cefalu and Vogel and the objective medical evidence (R. 17-21).  Lamonte's issues regarding these findings were considered above and rejected. The ALJ did not err in his determination of the residual functional capacity.

## RECOMMENDATION

Accordingly, IT IS RECOMMENDED that defendant's cross-motion for summary judgment (Rec. doc. 14) be GRANTED and plaintiff's motion for summary judgment (Rec. doc. 12) be DENIED.

## OBJECTIONS

A party's failure to file written objections to the proposed findings, conclusions and recommendations in a magistrate judge's report and recommendation within fourteen (14) calendar days after being served with a copy shall bar that party, except upon grounds of plain error, from

attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object.  <u>Douglass v. United Servs. Auto. Ass'n</u>, 79 F.3d 1415, 1430 (5th Cir. 1996) (*en banc*).

New Orleans, Louisiana, this 21st day of January, 2014.

**SALLY SHUSHAN**
**United States Magistrate Judge**